UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

H.A.

     Plaintiff,

v.

DAYARAM V. PATEL,

     Defendant.

CIVIL ACTION FILE

NO.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff files her Complaint and shows the Court as follows:

## Introduction

1.

H.A. is a victim of sex trafficking at the Airway Motel located at 720 Fulton Industrial Blvd NW, Atlanta, GA 30336. For approximately a month beginning in late July through late August 2015, when H.A. was 17 years old, she was sold for sex repeatedly at the Airway Motel. The Airway Motel was notorious for child sex trafficking and other criminal activity. At least two other teenage girls who were also sex trafficked at the Airway Motel in 2015 have previously sued Defendant for same. Besides these two girls, H.A. also personally observed other girls who were being sex-trafficked at the Airway Motel at the same time H.A. was being trafficked. Defendant Dayaram V. Patel and his motel employees were notorious for negligently and recklessly permitting, and profiting from, sex trafficking, drug dealing, and

1

violent crime that occurred at the Airway Motel.  As set forth herein, Defendant is liable to Plaintiff for damages arising from the crimes and harms committed against her.  Given the nature of the case, Plaintiff is identified in this Complaint by her initials. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

2.

During all relevant time periods, Defendant owned and operated the Airway Motel located at 720 Fulton Industrial Blvd NW, Atlanta, GA 30336.

3.

As the owner and operator of the Airway Motel, Defendant had ultimate responsibility for hiring, training, supervising, and managing the other Airway Motel employees, and Defendant was vicariously liable for the acts or omissions of same, as well as independently liable for his own acts.

4.

Defendant knew or should have known of the rampant sex trafficking and prostitution at the Airway Motel for years, before, during, and after Plaintiff's trafficking. Defendant knew or should have known, among other reasons, because:

---

[1] Plaintiff will be filing a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the sex trafficking of H.A.  Plaintiff's anonymity will provide for her own personal safety and will protect Plaintiff from the public disclosure of details which are intimate and personal in nature.

2

a. Underage victims of sex trafficking, including H.A., were forced to stand outside their motel rooms and/or walk in front of the motel in revealing clothing (including high heels, tiny shorts, and crop tops, as an example), while being watched by their sex traffickers, until the girls were approached by men who would negotiate to buy the girls and then take them into the motel rooms to have sex with them;

b. Sex buyers would frequently drive through the motel's U-shaped parking lot as if it were a busy fast-food drive through to look at all the different children, young girls, and women being sold for sex who were standing in front of their motel rooms or walking through the parking lot. The buyers would then stop and park in front of the victim they wanted to purchase. The buyers would then hand over money to the victims and/or their traffickers and proceed to enter motel rooms for short periods of time to have sex with the victims. After having sex with the victims, the buyers would get in their cars and leave;

c. The above pattern of activity occurred repeatedly in open sight at the Motel each day, throughout the day;

d. On average, Plaintiff H.A. would be sold to approximately 8 – 9 different buyers per day, and typically no less than 5 buyers per day;

3

e.    H.A.'s trafficker had a close personal relationship with the live-in Motel manager, and this manager allowed the trafficking to continue; additionally, the manager had personally visited another hotel and had sex with H.A. while she was being sex trafficked at a different location;

f.    H.A. also observed this same Airway Motel manager going in and out of the rooms of different girls who were being trafficked at the Airway Motel;

g.    H.A.'s trafficker brought her to the Airway specifically because another trafficker at the Airway told him it was a good place to sell girls and drugs;

h.    Defendant and/or his employees rented rooms at the motel to sex traffickers and drug dealers on an ongoing basis, in some instances for many weeks or months at a time;

i.    Defendant and/or his employees maintained close relationships with the sex traffickers and served as lookouts to ensure they could continue their sex trafficking operations;

j.    Defendant and/or his employees permitted a rap video to be filmed in public, open areas at the Airway Motel which depicted and glorified sex trafficking. Plaintiff H.A., along with another child sex

trafficking victim were captured in the rap video while being trafficked for sex at the Airway Motel;

k.   Sex traffickers would often get into physical fights with their sex trafficking victims in the parking lot of the motel, and the manager of the motel would tell them they needed to go back into the rooms so as not to be seen; and

l.   Defendant knew or should have known of rampant sex trafficking generally in the Fulton Industrial Boulevard area where the Airway Motel was located, and Defendant knew or should have known of the rampant sex trafficking at the Airway Motel specifically.

5.

Despite all of the above knowledge, Defendant negligently and recklessly failed to take appropriate and reasonable measures to prevent sex trafficking from occurring at his motel, including Plaintiff's sex trafficking in particular, and instead actively took steps to allow the trafficking to continue.

6.

At all times relevant to this Complaint, H.A. was a minor child victim of sex trafficking at Defendant's motel.

7.

Sex trafficking and prostitution were common occurrences at the Airway Motel and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the motel. Defendant is liable to Plaintiff for his and/or his employees and agents' actions and failures to act. Defendant's liability to Plaintiff is straightforward:

a. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person **knew or should have known** has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the motel, a common undertaking involving risk and potential profit, Defendant (i) rented a room to Plaintiff's trafficker so Plaintiff could be sold for sex at the hotel, and (ii) did so despite what Defendant knew or should have known about Plaintiff being a victim of sex trafficking at the motel. As a result of Defendant and/or his employees or agents' conduct, Plaintiff suffered physical and mental harms,

6

and Defendant is liable to Plaintiff for the damages arising from those harms under the TVPRA.

b.  The Airway Motel constituted a public nuisance under Georgia law because the motel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiff was sold for sex at the Airway Motel, causing her special damages.

c.  Because Plaintiff was a child when she was trafficked at the Airway Motel, Masha's Law, 18 U.S.C. § 2255, provides another avenue to pursue a civil remedy for the substantive violation of 18 U.S.C. § 1591, with the same substantive analysis as her § 1595 claim above.

8.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct personally or through one or more of his officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the Airway Motel.

7

9.

Further, a person under the age of 18 cannot consent to having sex in exchange for money under any circumstance. Any sale of sex in exchange for money involving a person under eighteen (i.e., "minor sex trafficking") is *criminal* sex trafficking under federal law. 18 U.S.C. § 1591(a). Minor sex trafficking does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a)(1), *et seq.* Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1). Still, Plaintiff H.A. was repeatedly sold for sex at the Airway Motel, and despite such crimes obviously occurring, Defendant failed to intervene in any way to report or stop such crimes.

10.

Plaintiff brings this suit against Defendant to recover for the physical, emotional, and mental harm caused by her sexual exploitation at the motel, which was permitted to occur as a direct and proximate result of Defendant's negligent, reckless, and willful failures to prevent prostitution, crime, violence, and sex trafficking from occurring at his motel.

**Parties, Jurisdiction, and Venue**

11.

H.A. was born in 1998 and was a minor at the time of her sex trafficking alleged herein. She has not yet turned 28 years old.

8

12.

At all times relevant to this Complaint, Defendant owned, managed, supervised, operated, oversaw, controlled the operation of, and rented rooms at the Airway Motel, from which Defendant benefited financially.

13.

Defendant is a resident of the State of Georgia and resides at 4109 Daniel Green Trail SE, Smyrna, Cobb County, GA 30080, where service can be made upon him.

14.

Jurisdiction and venue are proper as to Defendant, and Defendant was properly served with process in this action.

**Plaintiff H.A.'s Sex Trafficking at the Airway Motel**

15.

While she was 17 years old, H.A. was sex trafficked at the Airway Motel for approximately a month from around late July through late August 2015.

16.

H.A.'s sex trafficker sold H.A. to approximately 8-9 different buyers per day and typically no less than 5 buyers per day.

17.

While at the Airway Motel, H.A.'s sex trafficking occurred openly and obviously and was observed by the motel's manager, who also participated with the trafficker in allowing the trafficking to continue.

18.

While Plaintiff H.A. was being trafficked at the Airway Motel, a rap video was filmed at the Airway Motel.

19.

This rap video depicted and glorified the sex trafficking that was occurring at the Airway Motel, including that of Plaintiff H.A. and another teenage victim of sex trafficking.

20.

Defendant and his motel manager allowed the rap video filming despite the open and obvious activity involved in its filming.

21.

During the time H.A. was being trafficked for sex, Defendant and/or other motel employees either lived at the Airway Motel themselves or, at minimum, staffed the motel 24 hours per day / 7 days per week, and thus, Defendant and/or the other motel employees could see the sex-trafficking activity that was occurring openly and publicly on its property.

10

22.

Thus, Defendant and/or other motel employees frequently saw Plaintiff H.A., her trafficker, and the other sex traffickers and sex trafficking victims at the motel.

23.

Defendant and/or the other motel employees had friendly, close personal relationships with traffickers at the motel, including Plaintiff H.A.'s trafficker, and thus would participate and allow the trafficking to continue without interruption.

24.

While Plaintiff H.A. was trafficked for sex at the Airway Motel, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant and the other motel employees knew or should have known. These included Plaintiff's young age and inappropriate dress, Plaintiff being required to openly stand in front of the motel to be approached by adult male strangers who would then accompany Plaintiff into her motel room for short periods of time, and Plaintiff's monitoring and control by her trafficker.

25.

Plaintiff's sex trafficker operated openly and brazenly at the Airway Motel, as did other sex traffickers. In addition to Plaintiff H.A.'s trafficking, there were numerous other sex trafficking victims at the motel at any given time and numerous other traffickers controlling those girls at the motel.

26.

Due to the high number of victims being sold for sex at the motel, a large number of buyers frequented the motel each day. Defendant knew or should have known that this was an indication of sex trafficking, and minor sex trafficking, at the motel.

27.

Defendant knew or should have known that the Airway Motel served as an open market for sex, including with victim H.A., based on all of the obvious activity that would occur in the open and public areas on Defendant's motel property.

28.

On September 11, 2015, the Atlanta police and FBI Metro Area Trafficking Children Task Force raided the Airway Motel during a detail looking for underage victims of sex trafficking at the motel and located another teenage victim.

**Defendant's Knowledge of Prior Crime and Sex Trafficking at the Airway**

29.

For many years prior to Plaintiff's trafficking, the Airway Motel was rampant with other instances of sex trafficking, prostitution, crimes against women, dangerous illegal activity, drugs, and violence.

30.

Before and during Plaintiff's sex trafficking at the Airway Motel, Defendant and other Airway Motel employees knew or should have known about the crime, including specifically the sex trafficking occurring at the motel.

31.

Prior to Plaintiff's sex trafficking at the Airway Motel, Defendant and other Airway Motel employees knew or should have known that rooms at the Airway Motel were frequently used for short interactions of commercial sex with guests being trafficked at the motel.

32.

Prior to and during Plaintiff's trafficking at the Airway Motel, the premises and its approaches were known for crime, prostitution, and sex trafficking, which is why Plaintiff's sex traffickers kept Plaintiff at the Airway Motel to be sold for sex there. In short, Defendant provided a busy market for just that type of illegal activity.

33.

Prior and in close proximity to Plaintiff's trafficking at the Airway Motel, numerous witnesses observed obvious sex trafficking, prostitution, and other crimes occurring at the property:

**Witness Number 1**

34.

A witness named Mr. Upshaw who is familiar with the Airway Motel has provided a witness declaration attached hereto as Exhibit 1.

35.

During 2014 and 2015, Mr. Upshaw lived at the Airway Motel for several months while he was working as a security guard at nearby businesses. *See* Exhibit 1, ¶ 2.

36.

When staying at the Airway Motel, Mr. Upshaw saw approximately 10 girls per day walking around the property half dressed. A lot of these girls looked like teenagers and told Mr. Upshaw about how they had to sell themselves for sex and give the money to their pimp. Exhibit 1, ¶ 3.

37.

Mr. Upshaw saw truckers often park their trucks beside the motel and then walk through the motel parking lot to solicit sex from the girls who were being sold at the Airway Motel. Exhibit 1, ¶ 4.

38.

Mr. Upshaw also witnessed a lot of traffic from regular cars pulling through the parking lot like it was a fast food "drive through" with cars and men constantly

14

pulling through the parking lot and going in and out of the rooms of the girls being sold for sex. Exhibit 1, ¶ 4.

39.

Mr. Upshaw observed that most of the girls at the motel were under the control of a pimp, and he frequently saw these girls handing cash over to their pimps after a date with a buyer at the motel.  Mr. Upshaw also observed girls being thrown out of hotel rooms, with their teeth knocked out, and blackened eyes. Exhibit 1, ¶ 5.

40.

Mr. Upshaw also frequently spoke to whom he believed to be the property manager/owner of the motel, Mr. Patel.  Mr. Upshaw asked Mr. Patel if he would like Mr. Upshaw to do security at the motel to try to help the crime problem, but Mr. Patel told Mr. Upshaw that he did not want to pay for a security guard, nor would he give a discount on the room in exchange for Mr. Upshaw providing security. Exhibit 1, ¶¶ 7-8.

41.

Defendant and/or the other Airway Motel employees either saw or should have seen all of these same things that Mr. Upshaw saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

15

**Witness Number 2**

42.

A witness named Mr. Dumas who is familiar with the Airway Motel has provided a witness declaration attached hereto as Exhibit 2.

43.

Mr. Dumas worked at the Airway Motel for approximately one to two weeks in May 2015 helping paint the inside of some of the rooms at the Airway Motel. Exhibit 2, ¶ 1.

44.

Mr. Dumas witnessed that prostitution at the Airway Motel was obvious. While Mr. Dumas was at the Airway Motel he saw several girls standing in the doorway of their rooms trying to get men to come into their rooms to pay for sex. Exhibit 2, ¶ 3.

45.

One of the girls specifically asked Mr. Dumas if he wanted a date with her. Exhibit 2, ¶ 3.

46.

Mr. Dumas saw men pull up to the girls' rooms and go in for a short while each. In total, Mr. Dumas witnessed approximately six girls each day who were engaged in prostitution at the motel, and he witnessed numerous men hanging

16

around the motel who Mr. Dumas believed were doing something "sketchy or illegal." Exhibit 2, ¶ 4.

47.

On May 25, 2015, Mr. Dumas himself was the victim of a crime at the Airway Motel when his firearm was stolen from his vehicle while parked at the property.

48.

Defendant and/or the other Airway Motel employees either saw or should have seen all of these same things that Mr. Dumas saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

**Witness Number 3**

49.

Witness Number 3 is familiar with the Airway Motel and has provided a witness declaration attached hereto as Exhibit 3.

50.

Witness Number 3 lived at the Airway Motel off and on beginning in 2012 up until the time the motel eventually closed. Exhibit 3, ¶ 1.

51.

The whole time Witness Number 3 was at the Airway Motel, the prostitution and sex trafficking at the motel was rampant and very obvious. Girls were walking around the motel "picking up tricks and dates" all day and night. And, buyers and

17

pimps were always on the property.  Exhibit 3, ¶ 3.

52.

Witness Number 3 observed that girls would often stand out in front of the motel and flag down cars and truckers while wearing almost no clothes to get them to come to the Airway to buy sex.  And, buyers of sex would go in and out of the rooms every day at all hours of the day and night. Exhibit 3, ¶ 3.

53.

Witness Number 3 estimates that there were 10-20 girls being sold for sex at the Airway Motel and there were usually 20-30 pimps hanging around the motel, controlling those girls and selling drugs.  Exhibit 3, ¶ 4.

54.

Pimps would often rent multiple rooms at the Airway Motel depending on how many girls they had working there, and it was common for the pimps to have one room for the girls they were selling and another room for the pimps to also sell drugs out of.  Ultimately, if a pimp had several girls, they would have several rooms for the girls to work out of.  Exhibit 3, ¶ 5.

55.

Witness Number 3 and other girls were often beaten by pimps in the parking lot.  The Airway motel employees saw this kind of activity frequently and also saw girls with bruises and cuts on their faces from their beatings.  Exhibit 3, ¶ 6.

56.

While at the Airway Motel, Witness Number 3 observed 3-4 young girls who were obviously under the age of 18 being sold for sex at the motel. Exhibit 3, ¶ 7.

57.

Witness Number 3 observed that the manager of the Airway Motel would come to each door to pick up money for the next day's rent from the girls and pimps staying in the various rooms.  Exhibit 3, ¶ 9.

58.

Defendant and/or the other Airway Motel employees either saw or should have seen all of these same things that Witness Number 3 saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

**Witness Number 4**

59.

A witness named Ms. Wilcox who is familiar with the Airway Motel has signed a witness declaration that is attached hereto as Exhibit 4.

60.

Ms. Wilcox was at the Airway Motel in 2015, and while she was there she witnessed approximately 10 – 15 girls walking around the property who were often dressed in lingerie or just bras and panties staying at the motel. Based on her observations, Ms. Wilcox believed that some or all of these girls were being sold for

sex to buyers who would visit the property. Exhibit 4, ¶ 2.

61.

Ms. Wilcox believed these girls were being sold for sex based on the fact that they would often walk in front of the motel or stand outside their rooms waiting for men to approach them, and then the girls would take the men into their rooms for a short amount of time.  Ms. Wilcox also observed men who she believed to be the girls' pimps hanging around the girls at the motel.  Exhibit 4, ¶ 4.

62.

Although prostitution and sex trafficking were visible at the Airway Motel, Ms. Wilcox never saw or heard of any of the motel employees telling any of the pimps or other criminal to leave the property or otherwise taking any action to try to stop any of the activity occurring.  Exhibit 4, ¶ 9.

63.

Defendant and/or the other Airway Motel employees either saw or should have seen all of these same things that Ms. Wilcox saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

**Prior Police Activity at the Airway Motel**

64.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Airway Motel.

20

Much of this activity either alerted or should have alerted Defendant and/or the other Airway Motel employees to the motel's rampant sex trafficking, prostitution, and sex crime problem. As mere examples, among many other instances, the police responded to the following prior incidents at the motel shortly prior to Plaintiff's trafficking:

    i.    On June 17, 2014, a man reported that he was robbed at the motel. Upon further questioning, the man advised that he was attempting to buy services from a prostitute and there was a dispute over money and that the female advised that she would need to check with her pimp. Shortly thereafter, the pimp entered the room, accused the man of disrespecting his prostitute and pointed a pistol in the man's face and then proceeded to steal $20 from the man before fleeing the motel room;

    ii.    On September 3, 2014, a victim flagged down police and said she was assaulted. After further questions, the victim told the police that she was rooming with a man who forced her to go out and see dates and advised the police that the man would "physically man handle her until she went onto the street and bring back money." She was "in fear of being continually harmed" and on the morning of the assault, she had attempted to leave, but the man "grabbed her by the arm, grabbed her by the throat and lifted her into the air causing her to choke and lose her breath";

21

iii.   On September 8, 2014, the police arrested a woman at the motel and noted that she was a "suspected prostitute in the area." The police also noted that "she was dressed provocatively wearing tight shorts and a see-through shirt"; and

iv.   On April 13, 2015, a victim reported to the police that she had been physically attacked by her "boyfriend" at the motel because the "boyfriend" wanted the victim's prostitution money in order to buy drugs. When the victim refused, the boyfriend attacked her. The police observed "a large bleeding bite wound to her right eyebrow and had blood on her shirt."

65.

These types of prior reported police activity, along with many other examples, all caused or should have caused Defendant and/or the other Airway Motel employees to recognize that the motel was frequently being used for the purposes of sex trafficking.

**Defendant's Negligent Failure to Act**

66.

Defendant and the other Airway Motel employees knew or should have known that obvious sex trafficking, including Plaintiff's sex trafficking, was occurring every day at the Airway Motel.

22

67.

Despite this knowledge, Defendant negligently and recklessly allowed the crimes perpetrated against Plaintiff and other sex trafficking victims to continue.

68.

Despite the dangerous, illegal, and criminal activity at the motel, Defendant and the motel negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

69.

Despite having actual or constructive knowledge of this illegal activity, Defendant negligently failed to take reasonable and necessary steps to stop such illegal and dangerous activities from occurring.

70.

Additionally, Defendant and the motel negligently failed to provide proper training to their employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the motel.

71.

Defendant and the motel also negligently failed to provide proper training to their employees on what they were supposed to do if they saw or suspected that dangerous or illegal activity, prostitution, or sex trafficking was occurring at the motel.

72.

Defendant and the motel also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, on how the staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so that the motel could better deter or prevent crime in the future.

73.

Defendant and the motel also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

74.

Defendant and the motel knew or should have known that they were permitting the motel to be used as a place of prostitution and sex trafficking.

### Defendant's Knowledge of Sex Trafficking Generally

75.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

76.

Defendant knew or should have known that during the relevant period Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at the Airway Motel. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex trafficking economies in the country.[2]  In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting motel rooms used for the trafficking of Plaintiff and other victims.

77.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex

---

[2] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited May 21, 2026); *see also* Meredith Dank, et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014), 30-32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited May 21, 2026).

trafficking,"[3] and as "the number one city for child sex trafficking."[4]

78.

Defendant knew or should have known that the motel and the surrounding Fulton Industrial Boulevard area were known to be common and notorious locations for prostitution, sex crimes, and sex trafficking to occur.[5] That is why Plaintiff's trafficker sold her there.

79.

Defendant knew or should have known that motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking.  Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443,

---

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited May 21, 2026).
[4] *Id.*
[5] *See, e.g.*, Meredith Dank, et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014) (noting that "street-level prostitution . . . occurs along specific tracks within more densely urban areas, particularly the Fulton Industrial area."), 123, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited May 21, 2026); Aaron Diamant, *Loophole Helps Cheap Hotels Serve as Safe Havens for Violent Crime,* WSB-TV 2, (May 21, 2016) https://www.wsbtv.com/news/2-investigates/loophole-lets-cheap-hotels-serve-as-safe-havens-for-prostitutes-pimps-and-drug-dealers/292230950/ (last visited May 21, 2026).

2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

80.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that ninety-two percent of the calls it received involving motels and motels reported sex trafficking, and another two percent reported a combination of sex and labor trafficking.[6] And the Polaris Project found that "75% of [trafficking] survivors responding to Polaris's survey reported coming into contact with motels at some point during their exploitation . . . . Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from motel staff."

81.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[7]

82.

Defendant knew or should have known that the Code, which lays out well-

[6]   *Human Trafficking and Hotels & Motels*, Polaris Project, https://polarisproject.org/human-trafficking-and-hotels-motels/ (last visited May 21, 2026).
[7] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 21, 2026).

27

established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels can take:

a.  establish corporate policy and procedures against sexual exploitation of children;

b.  train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c.  include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d.  provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e.  support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

f.  report annually on the company's implementation of Code-related activities.

83.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels the tools to address the scourge of sex trafficking at motels.

84.

Defendant knew or should have known that during the relevant period the

28

Department of Homeland Security ("DHS") published guidelines to help motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and motels, such as:

    a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    b. persons who lack freedom of movement or are constantly monitored;

    c. persons who have no control over or possession of money or ID;

    d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

    e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

    f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

    g. extended stay with few or no personal possessions in the room;

    h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

    i. the same person reserves multiple rooms;

    j. a room is rented hourly, less than a day, or for an atypical extended stay;

    k. attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.

85.

Without a market, a place for the buying and selling of humans for sex, sex trafficking would cease to exist. Defendant, for a fee, provided that market, a private and anonymous market for Plaintiff to be sold for sex at Defendant's motel.

**COUNT I:**
**STATUTORY LIABILITY: SEX TRAFFICKING**
**18 U.S.C. § 1595**

86.

Plaintiff incorporates the paragraphs above as if fully restated herein.

87.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

88.

Defendant knowingly benefitted from Plaintiff's sex trafficking by receiving

30

revenue generated by the operation of the Airway Motel, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Airway Motel, Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees.

89.

Defendant participated in a Motel venture and knew or should have known that his operation of the Airway Motel violated the TVPRA by harboring and falsely imprisoning Plaintiff so that she could be sold for sex at the Motel. Defendant also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiff's sex trafficker to harbor, falsely imprison, and traffic Plaintiff at the Airway Motel.

90.

As part of her sex trafficking, Plaintiff was falsely imprisoned at the Airway Motel. Defendant also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiff's sex trafficker to harbor, falsely imprison, and traffic Plaintiff at Defendant's Motel.

91.

The venture in which Defendant participated was in or affecting interstate commerce.

92.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives participated in Plaintiff's child sex trafficking at the Airway Motel. Defendant knew or should have known of this participation.

93.

Defendant also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Airway Motel.

94.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of his agents and representatives.

95.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

96.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18

U.S.C. § 1595(a).

97.

Defendant is liable for damages arising from the indivisible injuries he caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

**COUNT II**
**STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255**

98.

Plaintiff incorporates the paragraphs above as if fully restated herein.

99.

Plaintiff was under the age of 18 when she was trafficked at the Airway Motel.

100.

Plaintiff was a victim of violations of 18 U.S.C. § 1591 at the Airway Motel.

101.

As described herein and specifically in paragraphs 86-97, Defendant knowingly benefited from participating in a venture that he knew or should have known engaged in an act of sex trafficking at the Airway Motel, including the harboring and other trafficking activities which harmed Plaintiff.

102.

Plaintiff suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

103.

Thus, as described herein, Defendant is jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT III**
**NUISANCE**

104.

Plaintiff incorporates the paragraphs above as if fully restated herein.

105.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

106.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

107.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does

34

not participate causes special damage to an individual, such special damage shall give a right of action."

108.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

109.

The Airway Motel's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

110.

The Airway Motel caused or contributed to a blighting effect on the surrounding community, so that the Airway Motel negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Airway Motel, although the effects on each person may have varied.

35

111.

The illegal prostitution and sex trafficking nuisance occurring at the Airway Motel had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

112.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the Airway Motel caused special damages to Plaintiff, as she was the victim of child sex trafficking at Defendant's nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

**Public Nuisance Per Se**

113.

The Airway Motel constituted a statutory nuisance per se under Georgia law because Defendant knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Airway Motel, including sex trafficking.

114.

A business where illegal practices are permitted constitutes a nuisance.

115.

A business, like the Airway Motel, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

116.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Airway Motel that permitted illegal sexual activity to occur there.

117.

Defendant is liable for nuisance (public nuisance and/or per se public nuisance) by reason of his failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendant has express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

**DAMAGES**

118.

Plaintiff incorporates the paragraphs above as if fully restated herein.

119.

As a proximate and foreseeable result of Defendant's violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other

damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

      a.     Personal injuries;

      b.     Past, present and future conscious pain and suffering;

      c.     Loss of enjoyment of life;

      d.     Mental anguish and emotional distress;

      e.     Incidental expenses;

      f.     All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

      g.     Consequential damages to be proven at trial.

### 120.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendant and his employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious

indifference to consequences.

121.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendant for the following:

a. Process issue as provided by law;

b. Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

c. Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

d. Plaintiff be awarded a trial by jury; and

e. Plaintiff have such other relief as this Court deems just

and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 22nd day of May, 2026.

**ANDERSEN, TATE & CARR, P.C.**

/s/ *Tyler Dillard*
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Jennifer M. Webster
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

This 22nd day of May, 2026.

**ANDERSEN, TATE & CARR, P.C.**

/s/ *Tyler Dillard*
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Jennifer M. Webster
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680